**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MIDWEST OPERATING ENGINEERS** | ) | |
| **WELFARE FUND**, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 14 C 2557 |
| | ) | |
| **CLEVELAND QUARRY**, a division of | ) | |
| **RIVERSTONE GROUP, INC.**, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Midwest Operating Engineers Welfare Fund ("the Welfare Fund") and Midwest
Operating Engineers Pension Fund ("the Pension Fund"), collectively referred to as "the Funds,"
bring this action against Cleveland Quarry ("Quarry"), asserting that Quarry violated the
Employee Retirement Income Security Act ("ERISA"). As the Funds would have it, Quarry is
liable to them under 29 U.S.C. § 1145 ("Section 1145") because it stopped contributing
payments to the Funds sometime after September 2013 despite a continuing obligation to
contribute. Quarry, however, contends that the decertification of the union with which the
company had entered into a collective bargaining agreement ("CBA") -- the document that had
established its obligation to make contributions to the Funds -- terminated that obligation.

Because that dispute appeared to this Court to pose a pure question of law, it ordered
Quarry and the Funds to submit motions pursuant to Fed. R. Civ. P. 16 on the issue of liability.
They have done so. For the reasons set out below, this Court finds as a matter of law that the
Funds are entitled to enforce Quarry's obligation to contribute to the Funds under the CBA.

## Factual Summary

Effective May 3, 2010 Quarry entered into a CBA with Local 150 of the International Union of Operating Engineers ("the Union"). By its terms the CBA was to run until May 3, 2015 (CBA Art. 24).

Under CBA Art. 8 Quarry promised to make payments to the Welfare Fund for the benefit of its employees, while under Art. 21 it made a like promise of payments to the Pension Fund. Quarry also agreed to abide by each Fund's separate Agreement and Declaration of Trust, which the CBA incorporated by reference (CBA Art. 8 § 1 and Art. 21 § 1).

Quarry honored those contribution obligations until September 2013,[1] when the NLRB decertified the Union as the collective bargaining representative for Quarry's employees (Funds Mem. 2). At that point Quarry stopped making reports and payments to the Funds (id.). On April 9, 2014 the Funds filed this action, alleging violations of Section 1145 and demanding back payments from October 2013 onward (Amended Complaint ¶ 9).

## Continued Liability for Contributions

First at issue is the question whether the Funds can effectively enforce the CBA at all. Quarry argues they cannot. When a union that has entered into a CBA with an employer is decertified before the expiration of that agreement, the decertification renders the CBA unenforceable by the union for most purposes (see Central States, SE & SW Areas Pension Fund v. Schilli, 420 F.3d 663, 669 (7th Cir. 2005)). Quarry seeks to extend that principle to a claimed

---

[1] For whatever reason, neither the Funds' nor Quarry's memoranda specify the precise date of decertification. But Quarry's aborted motion for summary judgment -- a motion that this Court struck because it had ordered motions limited to the question of liability, not motions for summary judgment -- does have attached to it an NLRB Certification of Results of Election dated September 16, 2013.

automatic extinction of its contribution obligations, which stemmed from a CBA, as the result of decertification of the Union -- the other party to that CBA (Quarry Mem. 3).

But Quarry's contention is precisely the "decertification defense" that Schilli, 420 F.3d at 671 rejected:

> [A] union's lack of majority support or authority to collectively bargain, standing alone, will not preclude liability under § 1145.

Instead employer liability to an employee benefit fund under Section 1145 survives the decertification of a union because of the nature of a fund's independent right to enforce the terms of a CBA.  And our Court of Appeals' en banc opinion in Central States, SE & SW Areas Pension Fund v. Gerber Truck Serv., Inc., 870 F.2d 1148 (7th Cir. 1989), a case on which Schilli relied extensively, explained that right by way of analogy (id. at 1149 (internal citations omitted)):

> The pension or welfare fund is like a holder in due course in commercial law, or like the receiver of a failed bank -- entitled to enforce the writing without regard to understandings or defenses applicable to the original parties.

Funds have such an expansive right of enforcement because they must "rely on documents to determine the income they can expect to receive, which governs their determination of levels of benefits.  Once they promise a level of benefits to employees, they must pay even if the contributions they expected to receive do not materialize" (id. at 1151).  Hence, as Gerber Truck, 871 F.2d at 1153 (quoting Section 1145 directly, with case citation omitted) teaches:

> The text of § [1145] is adapted to its purpose, making promises enforceable "to the extent not inconsistent with law".  If the contract provides for the commission of unlawful acts, it will not be enforced.  If the employer simply points to a defect in its formation -- such as fraud in the inducement, oral promises to disregard the text, or the lack of majority support for the union and the consequent

ineffectiveness of the pact under labor law -- it must still keep its promise to the pension plans.

Quarry's only attempted argument against the Funds' ability to enforce the CBA is "the lack of majority support for the union and the consequent ineffectiveness of the pact." But Schilli and Gerber Truck have flat-out foreclosed that argument. Thus the Funds are entitled to enforce Quarry's promises, as contained in the CBA, to contribute to the Funds.[2]

That the Funds are entitled to enforce the CBA does not end the inquiry, however. Quarry also contends that the CBA's very terms relieve it of any obligation to contribute to the Funds after the Union's decertification (Quarry R. Mem. 1-2). As the ensuing analysis demonstrates, however, that argument is unpersuasive as a matter of contract construction buttressed by common sense.

ERISA-governed benefit plans are interpreted according to federal common law, informed as it may be by state common law principles of contract interpretation (see Central States SE & SW Areas Pension Fund v. Waste Mgmt. of Mich., Inc., 674 F.3d 630, 634 (7th Cir. 2012)). This opinion adheres to the approach of Waste Mgmt. of Mich., id. at 635-36 in interpreting not just the Agreement and Declaration of Trust of each of the Funds but also the CBA, the latter according to the federal common law developed in the context of ERISA litigation. ERISA agreements are construed according to the familiar "four corners rule": If the CBA and the trust documents are unambiguous on their face, this Court cannot look beyond the

---

[2] Quarry's other argument -- that employer contributions to a pension fund after decertification are illegal under labor law (Quarry R. Mem. 5-6) -- is plainly contradicted by the very statute that Quarry cites in purported support of its argument. Although the Labor Management Relations Act (29 U.S.C. § 186) does indeed prohibit employers from making payments to representatives of their employees, that section's subsection 186(c)(5) expressly exempts contributions to pension and welfare funds from that section's prohibition.

documents themselves in interpreting their meaning (id. at 634) -- but for that purpose documents are deemed ambiguous when they admit of more than one reasonable interpretation (id.).

So Quarry's argument can succeed only if the applicable ERISA agreements -- comprising here the two Agreement and Declaration of Trust documents as well as the CBA -- unambiguously preclude liability. First of all, each of the Agreement and Declaration of Trust documents, to which Quarry assented as part of the CBA, directly binds Quarry to make contributions "upon the terms and conditions specified in the applicable Collective Bargaining Agreement" (Welfare Fund Agmt. & Decl. of Trust[3] Art. 6; Pension Fund Agmt. & Decl. of Trust Art. 6). Those terms and conditions appear principally in CBA Art. 8 § 1 and Art. 21 § 1, the first of which reads in relevant part:

> [T]he Employer shall make the following contributions for each hour for which an employee receives wages under the terms of this Agreement payable to the Midwest Operating Engineers Welfare Fund.

Similarly, Art. 21, § 1 reads:

> [T]he Employer will contribute the sum of $4.40 per hour for each hour for which an employee receives wages under the terms of this Agreement to the Midwest Operating Engineers Pension Fund.

By its terms, then, the CBA reflects Quarry's agreement to make contributions to the Funds based on a calculation that involves counting up the number of work-hours compensated "under the terms of this Agreement" and then multiplying that number by a specified sum.

---

[3] Funds Mem. 2 purported to cite from the Welfare Fund's Agreement and Declaration of Trust and purported to attach a portion of said document as Exhibit B to the same. But a look at that attached document revealed it to be one entitled "Health and Welfare Plan of the Midwest Operating Engineers Welfare Fund." Nothing in the CBA binds Quarry to that plan, so that its inclusion by the Funds might have been inadvertent. In any case, on this Court's request counsel for the Funds provided the Court with a copy of the Welfare Fund's Agreement and Declaration of Trust.

Liability thus turns on the phrase "under the terms of this Agreement." At first glance that might perhaps be viewed as requiring a finding of no liability. After all, if the CBA were no longer to be of any force at all due to the Union's decertification, there would arguably be zero hours "for which an employee receives wages under the terms of this Agreement." And of course zero multiplied by any number is zero. That reading would arguably do away with any obligation of Quarry to contribute to the Funds after the decertification date.

Only a moment's reflection is needed to reveal that matters are not so simple as the reading suggested by the last paragraph would have it. That reading requires the locution "under the terms of" the CBA to mean something like "under the authority of" the CBA -- the idea being that once the Union was decertified, the CBA no longer had any legal authority that might govern the compensation of employee time.[4] But what any such proposed construction ignores is the obvious fact that every CBA by definition contains language comparable to that -- language that defines the employees that it covers as being within the scope of the bargaining unit (whether solely union personnel or union and nonpersonnel together) for whom the employer must make the contributions described by the CBA.

So to read the language literally in such an unthinking manner would strip those employees of their employer's contributions towards its own contracted-for benefits just because

---

[4] Even if Quarry's reading were correct, that would not necessarily deprive its employees of an entitlement to its continued contributions. Employees are, in a limited sense peculiar to labor law, also third party beneficiaries of CBAs (see generally 20 Williston on Contracts § 55.60 (4th ed.)). Some 50 years ago our Court of Appeals explicitly left open the question whether the right of individual employees to enforce a CBA survived the decertification of the union that had negotiated it (Retail Clerks Int'l Ass'n AFL-CIO v. Montgomery Ward & Co., 316 F.2d 754, 757-58 (7th Cir. 1963)). It has not returned to the question. But if employees do retain such a right, then the CBA on which Quarry and the Union reached agreement is still enforceable (although not by the Union). So the analysis set out in the ensuing text could apply in more ways than one.

- 6 -

the employer no longer owes those obligations to the contracting union by reason of decertification. And that in turn would deprive every employee benefit plan of the entitlement that Gerber Truck and its progeny so compellingly demonstrate is essential to ERISA. Although the excerpt quoted earlier from Gerber Truck encapsulates that concept in comparative microcosm, defense counsel (and even more importantly, their client) ought to read -- better still, ought to understand -- the lengthier eloquent explanation in Gerber Truck, 870 F.2d at 1151-55.

In sum, the approach urged by Quarry would render meaningless the concept that employee benefit plans, essentially third party beneficiaries of CBAs in their provisions as to promised employee plan benefits, retain enforceable rights to those benefits even though the direct party to the CBA -- a union -- no longer has its right of enforcement due to decertification. Quarry's approach aptly calls to mind the scene in which Macbeth suddenly wakes up to the fact that all the promises by the three witches that he has taken literally are really empty because when fully understood they are no more than empty promises -- when he exclaims:[5]

> And be these juggling fiends no more believ'd
> That palter with us in the double sense,
> That keep the word of promise to our ear
> And break it to our hope.

Just so, Quarry would keep the word of promise to the Funds' figurative ears -- "yes, you may retain the right to enforce the CBA although the union no longer can" -- but would break it to their hope: "there is nothing for you to enforce, because our employees no longer serve under the CBA." Instead the obvious answer is that the contractual reference to "an employee [who] receives wages under the terms of this Agreement" speaks generically, vis-a-vis benefit plans

_____

[5] William Shakespeare, Macbeth act 5, sc. 8, lines 19-28.

- 7 -

post-decertification, of employees of the type who were encompassed within the bargaining unit that had been covered by the CBA (for example, employees within a particular trade or trades). That is surely more than an entirely permissible reading, and most importantly one that jibes with rather than flouts the considerations that such cases as <u>Gerber Truck</u> and its progeny have identified and honored.

Under that more appropriate reading called for by the caselaw, Quarry's obligation to contribute has survived the decertification of the Union. Although the CBA no longer binds Quarry to pay its employees the contractually specified wages, nothing stands in the way of ascertaining the hours for which Quarry's post-decertified employees perform work that had been covered by the CBA.[6] Requiring an employer (or a district court) to determine which employees are covered by a CBA otherwise ineffective as to the contracting union would not be an unusual task in the Section 1145 context (see <u>Moriarty v. Svec</u>, 164 F.3d 323, 334-35 (7th Cir. 1998)).

### Conclusion

Quarry's effort to be a free rider -- to make no contributions to the Funds even though its employees continue to be Fund beneficiaries -- directly contravenes the teaching of such cases as <u>Gerber Truck</u> and <u>Schilli</u>. That effort, however, depends on a woodenly literal interpretation of the CBA that those caselaw teachings reject -- a distorted meaning that is trumped by a more plausible reading.

Based on what has been said here, the Funds are entitled to enforce Quarry's obligation to contribute to the Funds in an action under Section 1145, notwithstanding the Union's

---

[6] Such hours might include, for example, all those performed by employees falling into the job classifications covered by CBA Art. 1 § 1 or those paid according to CBA Art. 9 § 1's wage table.

- 8 -

decertification in September 2013. This action is therefore set for a status hearing at 9:15 a.m.

September 5, 2014 to discuss the procedure for quantifying Quarry's obligations.

_____

Milton I. Shadur
Senior United States District Judge

Date: August 25, 2014

- 9 -